**IN THE UNITED STATES DISTRICT COURT FOR THE**
**WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| ROBERT DEW, | ) | |
| | ) | |
| Plaintiff, | ) | CIVIL ACTION NO. |
| v. | ) | |
| | ) | |
| CITY OF PITTSBURGH; | ) | JURY TRIAL DEMANDED |
| NATHAN HARPER, Pittsburgh | ) | |
| Bureau of Police; PAUL | ) | |
| DONALDSON, Deputy Chief, | ) | |
| Pittsburgh Bureau of Police; | ) | |
| Lt. ED TRAPP; DOUGLAS | ) | |
| HUGNEY; Officer CONDON, | ) | |
| Badge No. 3561; OFFICERS | ) | |
| DOE 1-100, | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

<u>COMPLAINT</u>

## I.  INTRODUCTION

1.     This civil action is brought to redress the violations of

Plaintiff Robert Dew's constitutional rights when, despite the fact that he was

a professional journalist on paid assignment to cover the G-20 Summit and

the resulting protests, he was wrongfully detained, falsely arrested, and

wrongfully imprisoned on the night of September 25, 2009 and the morning

of September 26, 2009, during the mass arrests carried out on the lawn of the

University of Pittsburgh's Cathedral of Learning with the express and/or tacit

authorization of the City of Pittsburgh and its police officials.

2.     At all times while he was in Pittsburgh, during and after the G-20

Summit, during the protests, and at the time of his wrongful detention, arrest,

and imprisonment, Mr. Dew was on paid assignment as a journalist for Free

Speech Systems, LLC, which is the parent company of Infowars.com and the

Alex Jones Show, a nationally syndicated alternative media outlet with an audience of millions. At all times while on that assignment, while video taping events and conducting interviews, he wore a clearly visible press pass, which identified him by name as a professional journalist for Infowars.com.

3. Mr. Dew had no role in any protests, had no part in any unruly assembly, at no time disturbed the peace, at no time failed to comply with any commands to given to him by police, and at no time did anything other than act as a professional journalist lawfully engaged in First Amendment protected free speech and free press activity when, without any probable cause, or reason to believe that he had engaged in any criminal offense, and while openly wearing press credentials and carrying a professional grade video camera, he was detained, arrested, and imprisoned by uniformed City of Pittsburgh police officers, or other police officers acting under the authority of the City of Pittsburgh, who assaulted him, wrongfully detained and arrested him, put him in fear of serious bodily harm, and held him against his will in false imprisonment under harsh conditions overnight for approximately twelve hours. During his false imprisonment, Mr. Dew was forced to sit outdoors in cold and rainy weather, despite wearing only a tee-short and shorts. The false charges against Mr. Dew, of failure to disperse and disorderly conduct, were later withdrawn.

4. This suit seeks to establish the legal liability of those individuals who unlawfully detained, falsely arrested, and wrongfully imprisoned Mr. Dew. This suit also seeks to establish the responsibility of the municipal Defendant, the City of Pittsburgh, for lack of proper training, supervision and oversight of the officers involved in the mass arrests during the night of

September 25, 2009.

5. This lawsuit contends that the actions of the Defendants violated Mr. Dew's constitutional rights as secured by the Civil Rights Act of 1871, 42 U.S.C. §1983, which creates a cause of action to enforce the rights guaranteed by the Bill of Rights and Fourteenth Amendment to the United States Constitution. Specifically, this suit contends that the actions of the Defendants violated Mr. Dew's rights under the Fourth Amendment to be free from unreasonable searches, seizures, and deprivation of liberty, as well as his rights under the First Amendment to free speech, peaceable assembly, and the freedom of the press, and his rights under the Fourteenth Amendment to be free from government policies and actions which acquiesce in, condone, or otherwise expressly or tacitly approve of such violations of rights. Arbitrary arrest of professional journalists who are covering political events and filming police crackdowns and mass arrests of protesters is a hallmark of oppressive and totalitarian regimes the world over, and such arrest of journalists is incompatible and antithetical to a free society with a free and vigilant press, serving to chill both free speech and free press activities. The arrest, detention, and imprisonment of Mr. Dew while acting as a journalist amounted to retaliation for exercise of constitutionally protected First Amendment rights and false arrest and malicious prosecution in violation of the Fourth Amendment. Plaintiff seeks damages for the violations of those First Amendment rights of free speech, assembly, association, and freedom of the press, as well as for deprivation of liberty, emotional distress and

psychological trauma, and physical deprivation cause by defendants' actions.

6.    Through this action, Mr. Dew seeks an award of all appropriate remedies including, but not limited to, monetary damages, both compensatory and punitive, and such other relief, including an award of attorney fees and costs, as are necessary and appropriate to ensure and effectuate his civil rights under the United States Constitution.

## II.    JURISDICTION AND VENUE

7.    This action is brought pursuant to 42 U.S.C. § 1983. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1343(3) and (4). This Court also has jurisdiction pursuant to 28 U.S.C. §§ 2201 and 2002 to declare the rights of the parties and to grant all further relief found necessary and proper.    Plaintiff further invokes the supplemental jurisdiction of this Court pursuant to 28 U.S.C. § 1367 (a).

8.    This Court has personal jurisdiction over the defendants, who are located in the Western District of Pennsylvania.

9.    Venue is proper in the Western District of Pennsylvania pursuant to 28 U.S.C. § 1391(a) in that the defendants are subject to personal jurisdiction within the Western District of Pennsylvania and the events that give rise to this action occurred within the Western District of Pennsylvania.

## III.    PARTIES

10.    Plaintiff Robert Dew is, and at all relevant times was, a journalist residing in Austin, Texas, who traveled to Pittsburgh in September, 2009, leading a three man journalist film crew on paid assignment by their employer, Free Speech Systems, LLC which is the parent company of

Infowars.com and the Alex Jones Show, to video-record events during the G-20 Summit, conduct interviews, and give both live on-air and recorded news reports. Mr. Dew is, and at the time of his arrest on September 25, 2009 was, a paid correspondent, camera man, producer, editor, documentary film-maker, and production manager for both Inforwars.com and the Alex Jones Show, as an employee of Free Speech Systems, LLC. Infowars.com is the largest alternative news site as rated by Alexa.com with millions of online visitors each month and is regularly sourced by the Drudge Report (The largest news aggregate on the planet). The Alex Jones show is nationally syndicated with an estimated three million listeners daily on AM-FM, shortwave, and online audio stream, with over 180 million views on youtube (The Alex Jones Channel) and over 100,000 podcast downloads daily. Mr. Dew's past assignments for Inforwars and the Alex Jones Show included being sent to Sacramento, California to cover the phenomena of tent cities of homeless people, coverage of patriotic celebrations at Lexington and Concord Massachusetts on April 19, 2009, and travel to Florida to interview author John Perkins, to New York to interview author and trends forecaster Gerald Celente, to California to Interview author G. Edward Griffin, and travel to interview authors Marc Dice, Rosalind Peterson, and Tim Ball in Seattle. At all times relevant to this complaint, Mr. Dew was a resident of Austin, Texas. Prior to the events in this case, Plaintiff Dew was never arrested, never incarcerated, never prosecuted, or charged with any criminal offenses. At the time of his arrest, he was not engaged in any criminal activity, he was not engaged in a protest, he carried no sign, shouted no slogans or chants, sang no songs, or in any other way took part in the protests. At no time was he engaged in any disorderly conduct. At all relevant times, Mr. Dew's actions and speech were exclusively confined to his role as an investigative reporter, camera-man, documentary film-maker, and producer for Free Speech Systems, LLC, Infowars.com, and the Alex Jones Show, filming both the protesters and the police response, and conducting interviews, all of which are First Amendment protected free speech and free press activities, while wearing clearly visible press credentials. There was no basis to suspect, or any reason to believe, that he was engaged in any criminal activity.

11.     Defendant City of Pittsburgh ("City") is a municipal subdivision organized under the laws of Pennsylvania and owns, operates, manages, directs and controls the Pittsburgh Police Department, which during the G-20 Summit, and during the protests on the night of September 25, 2009, employed and deployed other defendants.

12.     Defendant Nathan Harper is, and at all relevant times was, the Chief of the Pittsburgh Bureau of Police.  On September 25, 2009, Chief Harper, acting under color of law and pursuant to the policies of the City, approved the unlawful dispersal order and the mass arrest, without probable cause, of Plaintiff Dew and others on account of their perceived political expression, regardless of whether there was reason to believe or suspect that any such persons had committed any crime, resulting in Mr. Dew, a journalist, being swept up in the mass arrest.  Chief Harper is named herein in his individual capacity.

13.     Paul Donaldson is, and at all relevant times was, the Deputy Chief of the Pittsburgh Bureau of Police.  On September 25, 2009, Deputy Chief Donaldson, acting under color of law and pursuant to the policies of the City, issued an unlawful order to disperse and ordered the mass arrest, without probable cause, of plaintiff and others on account of their perceived political expression resulting in Mr. Dew, a journalist, being swept up in the mass arrest. Deputy Chief Donaldson is named herein in his individual capacity.

14.     Ed Trapp is, and at all relevant times was, a lieutenant with the City of Pittsburgh Bureau of Police.   On September 25, 2009, Lt. Trapp was Deputy Chief Donaldson's assistant.  Acting under color of law and pursuant to the policies of the City, Lt. Trapp ordered the mass arrest, without probable cause, of plaintiff and others on account of their perceived political expression resulting in Mr. Dew, a journalist, being swept up in the mass arrest.  Lt. Trapp is named herein in his individual capacity.

15.     Douglas Hugney was, at all relevant times, a police officer with the City of Pittsburgh Bureau of Police.  On September 25, 2009, Defendant Hugney, acting under color of

law and pursuant to policies of the city, allegedly relying on information provided by Defendant Officer Condon, signed off as the arresting officer on the criminal complaint falsely charging Plaintiff Dew with failure to disperse and disorderly conduct. Defendant Hugney is named herein in his individual capacity.

16. Officer Condon, Badge Number 3561 (according to the criminal complaint signed by Defendant Hugney), was, at all relevant times, a police officer with the City of Pittsburgh Bureau of Police. On September 25, 2009, Defendant Condon, acting under color of law and pursuant to policies of the city, participated in the arrest without probable cause, of Mr. Dew, a journalist, who was swept up in the mass arrest of others on account of their perceived political expression. Defendant Condon is named herein in his individual capacity.

17. The Doe defendants are other law enforcement officers who, acting under color of law, designed, ratified, approved, implemented, and/or applied the City's isolation and containment policy resulting in an across the board suspension of citizens' constitutional rights including rights protected under the First and Fourth Amendments to the United States Constitution, and carried out the mass arrest, without probable cause, or Plaintiff and others, based on perceived political expression and viewpoints, resulting in Plaintiff Dew, a journalist, being swept up in the mass arrests. The Doe defendants are named herein in their individual capacities.

## IV.     FACTUAL ALLEGATIONS

18. The City of Pittsburgh hosted the G-20 Summit, a meeting of the Group of Twenty Finance Ministers and Central Bank Governors, on September 24-25, 2009.

19. As part of the G-20 security measures, the city of Pittsburgh hired, employed, and/or deputized law enforcement officers from various police departments throughout the United States to supplement its own police department.

20. The City of Pittsburgh retained command, control, and authority over and was responsible for the deployment of various police officers in the City of Pittsburgh's G-20 Security

Force.

21.     Mr. Dew, leading the three man journalism crew from Infowars.com, and the Alex Jones Show, arrived in Pittsburgh on September 22, 2009 with co-workers Jason Bermas and Jason Douglass to film and report on the G-20 and resulting protests, and to conduct interviews with both protesters, officials, police, and possible military personnel during the G-20 event and surrounding events.     Upon arrival on September 22, 2009, Mr. Dew and his film crew filmed "establishing shots" of the city from Mt. Washington and then filmed footage of workers setting up of walls and barricades in the downtown area.

22.     On September 23, 2009, Mr. Dew and his team shot downtown footage of police arriving into the city and businesses boarding up windows.  Also on that day, Mr. Dew and his team attended and filmed the green jobs festival.  Then, following a tip about National Guard being deployed for use in Pittsburgh during the G-20, Mr. Dew and his team traveled to the Air National Guard 171st Air Refueling Wing in Coraopolis, Pennsylvania on the evening of September 23, 2009 to interview National Guard Public Affairs Officer Lt. Col. Chris Cleaver about the number of guardsmen deployed into Pittsburgh.  Film footage of this interaction is part of the documentary *Police State 4: The Rise of Fema*.  That night, September 23, 2009, Mr. Dew and his journalism team/film crew also wrote an article about their interactions with both military and police personnel that was published on Infowars.com.

23.     On September 24, 2009, Mr. Dew and his film crew checked out of their downtown hotel due to too many security check points in and out of the hotel which was impeding their ability to cover the events.  Instead, their employer, Infowars.com, rented a one bedroom apartment in the Lawrenceville neighborhood of Pittsburgh for the crew to operate from.  Mr. Dew and his journalism/film crew then covered a protest march for infowars.com.  After police used an LRAD sound weapon on protesters, Mr. Dew called in a live news report from the scene to the Alex Jones radio show, his employer, documenting the first use of LRAD on US citizens.  Clips of that news

report are available on the internet (at http://www.youtube.com/watch?v=GpCyiUeTy60) and are also in the documentary, Police State 4: The Rise of FEMA (available online at http://www.youtube.com/watch?v=Klqv9t1zVww, with the section on the G-20 starting at minute marker 57:00).

24.     On the morning of September 25, 2009, Mr. Dew and his crew experience technical difficulties and Mr. Dew and his co-worker Jason Douglass traveled to a local Walmart to look for firewire cables to capture HDV video and upload it to the internet.   After buying some adapters and cables, they returned to the rented apartment and tried for a several hours to get video to upload to the internet but were unsuccessful.

25.     Thereafter, Mr. Dew went out on his own to get lunch for the crew, but received a call from co-worker Jason Douglass relaying a message from Infowars.com headquarters in Austin that there was big march starting in Oakland and going downtown.   Mr. Dew immediately returned to the rented apartment, got his crew and cameras and drove to Oakland in their rental car.   Mr. Dew dropped co-workers Jason Bermas and Jason Douglass near the march and drove around to Forbes Ave to park the car.   He left the lunch in the car and followed this second protest march, filming as it moved from Oakland, near the University of Pittsburgh campus, toward downtown for a rally at the steps of a federal building which lasted between 1.5 to 2 hrs.

26.     Mr. Dew filmed as the march moved out of downtown Pittsburgh across the river via the 7th street bridge. Several lines of police started to march following the protestors.  Mr. Dew stayed back and taped the police marching.   He did not want to get stuck on the other side of the river. After the police marched the protestors out of downtown, Mr. Dew started to walk back to Oakland.  He caught a bus at Forbes Ave and rode it back to where his rental car was parked.

27.     Upon returning to the rental car, Mr. Dew sat in the car and ate his lunch.  He then drove to the north side of town via Lawrenceville and the 31st street bridge to pick up co-workers Jason Bermas and Jason Douglass and returned to the rental apartment to rest.  He then received

word from the Inforwars.com headquarters in Austin, Texas that there may be a protest in Oakland on the University of Pittsburgh campus that evening and his employer instructed him to cover the action.

28.     With an estimated three hours of downtime before any known protest, co-worker Jason Bermas attended a Pittsburgh Pirates game.   However, at approximately 9:30pm, Mr. Dew received a call from Mr. Bermas, who was calling from the University of Pittsburgh campus, informing Mr. Dew that there was a demonstration against police brutality taking place.  Mr. Dew had the crew's cameras in the rental car, and thus he drove to the campus and parked on Schenley Drive, where he met up with co-worker Jason Bermas and gave him a camera.  The two of them split up to more effectively film the goings on, with Mr. Bermas taking one camera, and Mr. Dew taking another.

29.     Mr. Dew observed between forty and fifty protestors with megaphones in Schenley Plaza, and an estimated hundred police, with both more protesters and more police arriving by the minute.  The police quickly surrounded the protestors.  Mr. Dew walked freely amongst the police, moving in and out of police lines, filming both the police and the protesters.  At all times, his press pass was out on the front of his shirt and clearly visible.

30.     Mr. Dew continued to film as the protestors were surrounded by the police in full riot gear, and observed as the police gave the protesters orders to disperse or they would be gassed.  Mr. Dew filmed as that particular protest broke up but the sight of so many police in riot gear drew crowds of students and more protestors to the scene.  Mr. Dew continued to document the events as police began to line up along Forbes Ave facing west.  As this was happening, Mr. Dew was still moving freely among the police, in and out of the police lines, as he filmed.   Mr. Mr. Dew walked in between two news vans and saw a major network photographer.   Mr. Dew asked the photographer if he thought it was safe to stay and tape and the photographer said he was staying, and told Mr. Dew "as long as you're showing your pass you should be ok."

31.     About this time the police line slowly started to march west on Frobes, as the officers banged their batons on their shields.   Mr. Dew was staying west of the line, just ahead of the advancing line of the police, filming the interaction between the protestors and police.  Footage from this point on, through his arrest, is available online at http://www.youtube.com/watch?v=QZff2TD7M-w.     The police line stopped just short of the Schenely Drive Extension.  Mr. Dew was southwest of the Stephan Foster memorial and on the north side of Forbes.  As Mr. Dew continued to film, he witnessed what looked like a student trying to walk past some police in riot gear along the same side of Forbes Ave that Mr. Dew was on. This individual was walking east.   Mr. Dew filmed as this individual was turned away by riot police and, as the individual started walking back toward Mr. Dew's location, Mr. Dew watched as the man was pushed from behind by a police officer, which caused the man to trip over a low chain fence and fall to the ground.  The man got up and yelled at the police.  From the distance Mr. Dew was at, he thought the man's face was bloodied by the fall.  But a moment later, as he got closer he saw that the man had crude blood makeup on his face.  A passerby asked Mr. Dew "what are you guys shooting for?" and Mr. Dew answered "Infowars.com" to which the man replied "nice." (3:06 of footage available online at http://www.youtube.com/watch?v=QZff2TD7M-w).     Mr. Dew continued to film as he started an interview with the man who had just fallen, asking him what happened and the man began to curse the police and use profanity.  Mr. Dew asked him a few questions and quickly ended the interview to continue filming the broader events.

32.     At this time, Mr. Dew observed as the police line that was on the south side of Forbes began to march north, pushing the people into the green space between the Cathedral of Learning and Heinz Memorial Chapel.   Mr. Dew still continued to walk among the police, in and out of their ranks as he filmed.  More riot police began to surround the west side of the green space on Bellfield Ave. and move along the natural barriers adjacent to the Cathedral of Learning.  Mr. Dew had now moved into the green space next to the Cathedral of Learning as he continued to film. Riot police we walking around Mr. Dew whole time. One officer shined a light at Mr. Dew, and

Mr. Dew grabbed his press pass that was hanging around his neck and held it out toward the officer to show him what it was and the officer moved his light off of Mr. Dew. The police lines were now very closely formed, and Mr. Dew began to walk to different areas to see if there was a way to get out of the park.

33.     Mr. Dew continued to film as the police began to round from Forbes Ave. to Bellfield Ave. Police had made it to the hedgerows and began to hack at the bushes with their batons. Mr. Dew heard a voice cry out for a medic (8:17 of footage available online at http://www.youtube.com/watch?v=QZff2TD7M-w) and Mr. Dew ran over and tried to shoot video of the treatment for tear gas or mace, but there was not enough light. Mr. Dew dug through his camera bag and found the camera light and attached it to his camera, but the light did not last very long. Mr. Dew say the riot police begin to violently push people into the hedges and, being concerned for his own safety, Mr. Dew decided it was time to leave.

34.     Mr. Dew headed towards Filmore Sreet but it became blocked. Mr. Dew heard a police officer say something to protestor and it sounded like the officer said "face down or your dead!" At this point Mr. Dew became extremely concerned for his own safety. Then he heard gun fire and a gas grenade hit the ground nearby. The people around Mr. Dew began to scatter. He tried to walk around the Heinz chapel and leave that way but more tear gas hit the ground, blocking his path in that direction.

35.     Mr. Dew walked west towards the Cathedral of Learning as police began beating their shields and walking up the hill to the north and off to Mr. Dew's left. It was at this point Mr. Dew realized there was no exit and he was completely surrounded by the riot police, who had formed a tight perimeter around Mr. Dew and approximately thirty to forty protesters. Another man filming asked Mr. Dew if he could share his footage with him, because the man's battery had just died, to which Mr. Dew replied "well. you'd have to talk to my boss" (at 15:47 of footage available online at http://www.youtube.com/watch?v=QZff2TD7M-w). The man told him he had

over twenty hours of footage he could share, so Mr. Dew gave him his phone number but also told him "I can't promise you anything" because the footage would be the property of Infowars.com, and he would need the approval of his boss, Alex Jones, before he could share it. Mr. Dew continued to film both the lines of riot police and the protesters, some of whom now put their hands up in a surrender posture as police closed in. Mr. Dew continued to film, slowly panning left and right, doing his best to get some steady, quality footage as the police lines closed in tighter on the protesters.

36.    As Mr. Dew continued to film, he observed a female journalist in a blue sweater hold up her press pass as she talked to the police on the line who looked like they were in charge. The police asked her "do you have your credentials?" and after she showed them her press pass, the police told her "go ahead" and stepped out of her way as she said "thank you" and walked through the line of riot police, as the officers in charge told the other officers to "let her out" (18:55 to 19:12 of footage available online at http://www.youtube.com/watch?v=QZff2TD7M-w). Mr. Dew decided to do likewise and moved toward the same police as they let the female reporter out. At that time he felt a tap on his shoulder, and Mr. Dew turned to see New York based activist Luke Rudkowski, the Founder of We Are Change, who began to tell Mr. Dew what had happened to him – that he had been beaten up and hit by a baton. As a producer at infowars.com, Mr. Dew knew Mr. Rudkowski, who had been a guest on the Alex Jones show and Mr. Dew had talked with him over the phone on several occasions to coordinate interviews. Consequently, Mr. Dew filmed a brief interview with Mr. Rudkowski, and then resumed his movement toward the two police offices who appeared to be in charge, who had let the female reporter pass through the riot police line.

37.    As Mr. Dew approached the officers, the officers told him that for his own safety he needed to get on the ground. Mr. Dew held up his press pass, which was at all times around his neck, and said "Can I get out? I'm press." One of the officers said "You're with the press?" Mr. Dew replied "Yes sir." The police officer asked "who are you with?" and Mr. Dew held his press

pass up closer to the officer so he could more easily read it, and answered "it's an Alternative media." An officer walked closer to look at Mr. Dew's press credentials and Mr. Dew continued to hold up his press pass, and as the officer read the press pass, Mr. Dew said "We're out of Texas" (meaning his employer, Infowars.com).

38.     The officer in charge told Mr. Dew to turn his camera off, and Mr. Dew replied "OK" and began to put his camera away, but the camera was still filming, and though the video is black after that point because the camera was now in the camera bag, it was still recording audio. As Mr. Dew put the camera in the bag, the officer said "Sir, you understand that you have to leave, if you come back you will be arrested. You understand that?" to which Mr. Drew replied "yes sir." The officer said "OK." Mr. Dew then pointed to Mr. Rudkowski and said "he's press too" which is true as Mr. Rudkowski conducts his own form of street journalism along with his activism. However, one of the other officers, referring to Mr. Rudkowski, said "he's been inciting the whole day" to which the officer who had just told Mr. Dew he could go pointed to Mr. Rudkowski and said "this guy?" and the other officer said "yes" and the first officer said "OK." As Mr. Dew was about to leave, he asked Mr. Rudkowski "you have my number, right?" so he could call Mr. Dew later to finish the interview. Mr. Dew's camera was still rolling, even though it was in the bag, and it continued to record audio.

39.     As Mr. Dew was waiting for a line to open up so he could pass through as the female reporter had done just moments before, another officer in full riot gear walked up off the line to Mr. Dew, grabbed his press pass, looked at it, and said "no, not press, not at all." This was after the other officer clearly said that Mr. Dew could go. Mr. Dew replied "not press?" and the officer, who had a female voice behind all the riot gear, said "no, no, no." At that moment one of the officers pushed Mr. Dew to his knees. Mr. Dew did not want to raise his voice or argue because he was intimidated by the heavy police presence and did want to be the victim of any violent acts, having already witnessed what happens to anyone the police perceive as not

complying. So in his calmest of voices Mr. Drew tried to convey the fact that he indeed was press, telling the officers "I am being paid to be here" and "I will leave."

40.     The officers would not listen to him, and despite the fact that his press credentials were still hanging around his neck, in plain view, his hands were forced behind his back and zip tie hand cuffs were placed tightly on his wrists.

41.     While he was being cuffed, Mr. Dew saw other officers walking by protestors and students who were laying on the ground and spraying a few of them in the face with mace. Mr. Dew was lifted up to his feet and told to bend forward, and with his head forced down, he was led through the police line. His shorts and camera bag were searched. With his hands cuffed behind his back, his bag became attached to him so he had to tell the officer how to disconnect the shoulder strap so his camera bag would not be stuck on his arm. Mr. Dew estimates that the time was between 10:30 pm and 11pm on September 25, 2009.

42.     Mr. Dew told the officer that was searching him that he was press, saying "I have my press pass on me" (22:43 of video at http://www.youtube.com/watch?v=QZff2TD7M-w). Mr. Dew also told the officer "I was just here covering the event. I wasn't inciting anything, I wasn't saying anything to the cops" (at 24:47). Mr. Dew asked the officer "is there anyone we can talk to, me being press and all?' and repeated "I'm being paid to be here." The officer said "I understand. Just got to talk to my boss." But that never happened. The officer asked him who he works for, and Mr. Dew answered "it's out of Austin, Texas, the site's Infowars.com" (at 25:11 audio). He also clarified that "we're not citizen media, we're a step up" to distinguish himself from others who may have been there as unpaid citizen video journalists.

43.     Despite having worn a plainly visible press pass that clearly identified him as press working for Inforwars.com, which multiple officers read, and despite repeatedly telling them he was press, that he was being paid to be there, and telling the officers who he worked for, and despite requesting to speak to a supervisor, Mr. Dew was nonetheless arrested. He was led a few

yards to police vehicle. There were 8 to 10 other people who were arrested along with him. At 27:43 his camera's tape ran out.

44.     Thereafter, he was led to the front driver's side of the vehicle to talk to another officer. He asked Mr. Dew for personal and identification, and Mr. Dew told the officer where he could find it.   He was then led to another larger group of arrestees who were all held at this location for about 15 to 20 minutes.  They were then led north to Fifth Ave. to line of busses.   Mr. Dew was lined up along with other people face towards the busses and then led onto a bus. There was a head-count taken and then after 5 minutes the buses took off.  They crossed one of the main rivers in Pittsburgh and ended up on the north side of the city. The busses parked in a parking lot next to a small building with a large walled off courtyard at one side.

45.     As Mr. Dew exited the buss, he was searched again, and his press pass was pulled out of his front pocket, where an earlier officer had put it.  Mr. Dew told three officers there that he was press and if they called his producer they could confirm the information was true. They ignored this request, and removed his plastic hand cuffs.  He was told to hold his arms together in front of him and tight metal cuffs were locked onto his wrists.   He was led through the courtyard in the building and told to sit in a chair next to a bunch of people with computers.

46.     After around 10 minutes He was brought to on of the tables.  His full fingers were scanned into a machine and he was asked for personal information along the lines of what the police had asked me when he was first arrested.   He now repeated what he had told every officer along the way, telling the person who was taking the information that he was press and she said he would have to talk to the police.

47.     After his information was entered into a computer, he was brought to a small area that had four rows of chairs.  He sat there and waited until his name was called and he then sat

down at a table across from an older man who did not have a police uniform on. This person conducted a psychological evaluation, asking Mr. Dew a series of questions on his mental and physical state.   As he had done with the others, Mr. Dew told this person that he was press and that all they had to do to verify that fact was to call his producer.  The older man said he would talk to one of the officers after he finished the evaluations.  But that did not happen.

48.     Mr. Dew was then led to a long line of chairs about six feet from where the psychological evaluations were being conducted  and given a brown bag filled some food, orange fruit drink, milk, apple, cookie and some sort of sandwhich. The food was vile, and Mr. Dew only ate the apple and drank the juice.  He watched others being processed.  Other detainees around him began to talk which brought guards who told them to keep quiet.  Mr. Dew I sat in that particular chair for about three to four hours total.  He almost fell asleep several times but every time he did, an officer would walk by and either kick his foot to wake him up or tell him not to fall asleep.

49.     During this time Mr. Dew saw several police carry a person in who had a bag over his head. This person seemed to be struggling lightly but was breathing very stressed and heavy, with big inhales and exhales. He was taken to a cell room.  His door was kept open and an officer in riot gear was seated at the entrance and a camera was set up facing the person in the cell.

50.     Approximately one and a half hours later, Mr. Dew was given another bag lunch. He ate crackers from this bag but not the apple, as after one bit he saw that the inside was brown.

51.     Mr. Dew, along with other detainees, was then led outside to the walled-in courtyard that contained about eight small tables with chairs.  He was told to sit at a table with three other people. It was much colder than when they had arrived at the facility, and Mr. Dew estimates that the temperature was in the lower 60's. A cold front had moved in and there was a slight drizzle that developed.  Mr. Dew was in shorts and a t-shirt and very cold.  He asked the guards if he could go back inside and they said no. The guards were wearing black tactical helmets w/o face shields, black shorts and pants with chest guards, knee pads and elbow pads. There were four initials on

their chest guards that spelled out CERT.  While outside Mr. Dew saw between thirty-five to fifty people being processed into the makeshift detention facility.  Mr. Dew was kept outside for at least four hours as the temperatures kept dropping and the drizzle turned into a light rain.

52.     After being outside in the rain for four hours, his name was read off a list by someone in a different looking blue guard uniform.  He was then taken inside for another three hours and was told all detainees would be processed as soon as they fixed the computers.  He was told that at some point in the night they had crashed and he saw other computers being brought into the side of the room where people were being processed.  At no time was he informed of any charges against him or told why he had been arrested.

53.     His name was finally called and he was taken outside with a group of six people. He was taken out in front of the detention area to a trailer.   He was given his camera bag and then told to follow the officer out of the parking lot across the street and to the corner. The rain started to get heavier.  His cuffs were taken off and he was told to walk away from the facility.   He had finally been released, without any charges being filed, or even being told why he had been detained, after spending approximately twelve hours in hand-cuffs while being falsely imprisoned.  He walked about three hundred yards to a dry spot under a bridge and called a cab, using his cell phone that had also been returned to him along with his camera gear.  The cab took about twenty minutes to arrive and it drove Mr. Dew and two other released detainees back to Oakland where Mr. Dew picked up his rental car which was still parked where he had left it the day before.  He drove back to the apartment to pick up his two coworkers and they drove to the airport, barely making their flight back to Texas.

54.     Mr. Dew's wife had been worried sick about him because she had been able to get hold of him and none of his co-workers had any idea what had happened to him until he was released the next day.   All they knew is he had disappeared over-night.  Mr. Dew's wife now worries whenever he goes on other business trips.

55.     Mr. Dew was later mailed a summons and charged with failure to disperse and disorderly conduct.  Those charges have subsequently been withdrawn.

56.     As a direct and proximate result of the action of all Defendants, Mr. Dew suffered injuries, including but not limited to financial injury, emotional and psychological pain and suffering, fear of bodily harm while being arrested, physical deprivation and pain while being hand-cuffed for approximately twelve hours, while being forced to remain awake all night, and while being forced to sit outside in cold and rainy weather for four hours, as well as deprivation of his liberty - being detained, arrested, and imprisoned for the first time in his life -  and injury to his reputation, all stemming from the violation of his constitutional rights while merely doing his job as a professional journalist, on paid assignment.  Defendants illegally detained, arrested, and jailed Mr. Dew without probable cause and in violation of his rights under the First and Fourth Amendments to the United States Constitution, including his right to be free from unreasonable searches, seizures, violation of his First Amendment protected rights of free speech and press, and the filing of false and malicious criminal charges.

57.     At all times relevant hereto, the violation of the plaintiff's rights under the first and fourth amendments came about as a result of the express policies, practices, and procedures of the defendant City of Pittsburgh and its Police Department, and the individually  named  police officers  and  officials,  who  participated in,  acquiesced in, and/or planned for the wholesale violation of citizens' constitutional rights during the G-20 Conference  by  suspending  the effective  operation of First and Fourth Amendment protections.

## V.  CLAIMS

### FIRST  CAUSE  OF  ACTION

### FIRST  AMENDMENT  RIGHT  TO FREE  SPEECH  AND PRESS (All Defendants)

58.     Plaintiff Dew incorporates by reference the allegations of the preceding paragraphs as though set forth at length herein.

59.     The observation, filming, commentary and reporting on of political demonstrations by members of the press are expression and action that is protected by the First Amendment to the United States Constitution.

60.     Defendants violated the First Amendment free speech, free assembly, and free press rights of Mr. Dew when,  pursuant  to  Pennsylvania's failure to disperse statute, 18 Pa. Cons. Stat. § 5502,  Defendants Harper and Donaldson ordered all people, including Mr. Dew, who was observing, filming, and reporting on the  demonstration in Schenley Plaza, to disperse on penalty of arrest, and the other Defendants enforced those commands in violation of Mr. Dew's rights by arresting him for merely carrying out his duties as a member of the press.

61.     Defendants' actions and omissions, as more fully described in the factual section of this Complaint, constitute violations of Plaintiff's rights, privileges and immunities, as secured by the First, Fourth and Fourteenth Amendments to the United States Constitution.  Said rights, privileges and immunities include the right to free speech and the right to peacefully assemble and the right to peacefully witness and right of the press to report on the conduct and procedures of law enforcement officials.

### SECOND CAUSE OF ACTION-FOURTH AMENDMENT
### RIGHT TO BE FREE FROM UNREASONABLE SEARCHES,
### SEIZURES, FALSE ARREST, AND FALSE IMPRISONMENT
(All Defendants)

62.     Defendants' actions and omissions, as more fully described in the factual section of this Complaint, constitute violations of Plaintiff's rights, privileges and immunities, as secured by the Fourth and Fourteenth Amendments to the United States Constitution.   Said rights, privileges and immunities include the right to bodily integrity, the right to be free from unreasonable searches and seizures and the right to be free from false arrest and imprisonment.

## THIRD CAUSE OF ACTION
### FIRST AMENDMENT RIGHT TO BE FREE FROM RETALIATION (All Defendants)

63.     Plaintiff incorporates by reference the allegations of the preceding paragraphs as though set forth at length herein.

64.     The observation, filming, commentary and reporting on of political demonstrations by members of the press is expression and action that is protected by the First Amendment to the United States Constitution.

65.     Defendants' detention, arrest, and imprisonment of Mr. Dew for engaging in constitutionally protected speech and press activity constituted unlawful retaliation in violation of his First Amendment rights.

## FOURTH CAUSE OF ACTION
### FOURTH AMENDMENT RIGHT TO BE FREE FROM MALICIOUS PROSECUTION (All Defendants)

66.     Plaintiff incorporates by reference the allegations of the preceding paragraphs as though set forth at length herein.

67.     Defendants' actions in authorizing and/or directing the filing of criminal charges against the Plaintiff without probable cause violated Plaintiff's Fourth Amendment right to be free from malicious prosecution.

## FIFTH  CAUSE OF ACTION
## FAILURE TO TRAIN, ENACT AND IMPLEMENT POLICIES AND
## SUPERVISE (City of Pittsburgh)

68.     The failure of Defendant City of Pittsburgh to train police officers in the proper circumstances and procedures for crowd control and other force and its failure to supervise its officers in this regard constitutes deliberate indifference to the rights of those who come into contact with the police.

69.     Plaintiff's injuries were the direct and proximate result of Defendant City of Pittsburgh's failure to provide training and supervision to the police officers serving on its G-20 Security Force.

70.     The need for training and supervision of the individual Defendants was  and should have been plainly obvious to the City of Pittsburgh policymakers.

71.     Defendants' actions and omissions, as more fully described in the factual section of this Complaint, constitute violations of the rights, privileges and immunities guaranteed by the First, Fourth and Fourteenth Amendments to the United States Constitution. Said rights privileges and/or immunities include right of free speech and pres, the right to be free from unreasonable searches and seizures and the right to bodily integrity.

## VI.     PRAYER FOR RELIEF

Wherefore, Plaintiff respectfully requests that the Court:

1.     Exercise jurisdiction over this action;

2.     Award appropriate compensatory damages against all
       Defendants;

3.      Award appropriate punitive damages against each of the
        Defendants; and

4.      Grant such other relief as may be appropriate,
        including the award of reasonable attorneys' fees,
        litigation expenses, and costs.

R e s p e c t f u l l y   s u b m i t t e d ,


By:  /s/ Elmer Stewart Rhodes III
**Elmer Stewart Rhodes III**
432 E. Idaho Street
Kalispell, MT 59901
Telephone: (702) 353-0627
FAX: (406) 755-8335
E-mail: stewart.rhodes@aya.yale.edu
Attorney for Plaintiff